The ESTATE OF Catherine Louise JONES, deceased, by and through Janice GAY, as Personal Representative, Plaintiff,

v.

BEVERLY HEALTH AND REHABILITATION SERVICES, INC. d/b/a Gulf Coast Convalescent Center, Defendant.

No. 5:98CV330 SPM.

United States District Court, N.D. Florida, Panama City Division.

May 24, 1999.

---

Allen Weldon Lindsay, Jr, Lindsay Andrews & Leonard, Milton, FL, Charles H Sinclair, Ford & Sinclair PA, Miami, FL, for Estate of Catherine Louise Jones, Janice Gay, plaintiffs.

Pamela Ann Moore, Andrew C Clausen, William Benjamin Broadwater, Carr Alford Clausen Etc, Mobile, AL, for Gulf Coast Convalescent Center, defendant.

Andrew C Clausen, William Benjamin Broadwater, Carr Alford Clausen Etc, Mobile, AL, for Beverly Health and Rehabilitation Services Inc, defendant.

### ORDER

JONES, United States Magistrate Judge.

Pending before the court is the Motion To Disqualify filed by defendant, Beverly Health and Rehabilitation Services, Inc., d/b/a Gulf Coast Convalescent Center ("BHRS") (Doc. 34) and its supporting brief (Doc. 35). Plaintiff's counsel, Charles H. Sinclair ("Sinclair") has filed a memorandum in opposition to the motion to disqualify (Doc. 46). On April 26, 1999 the court ordered that an evidentiary hearing was necessary in order to make a further inquiry regarding the allegations supporting the request for disqualification (Doc. 49). Accordingly, an evidentiary hearing on the motion to disqualify was held on May 6, 1999. At the hearing BHRS filed a bench brief in support of its motion (Doc. 53). Plaintiff was granted permission to file a reply to the bench brief, which was filed by Sinclair on May 11, 1999 (Doc. 54). The matter is now ripe for adjudication by the court.[1]

---

1. Because an order disqualifying counsel is a non-case-dispositive matter it may be handled by a magistrate judge as a pre-trial duty under 28 U.S.C. § 636(b)(1)(A). *See, Affeldt v. Carr,* 628 F.Supp. 1097 (N.D.Ohio 1985), *aff'd.,* 827 F.2d 769 (6th Cir.1987).

Beverly argues that Sinclair and the other members of his firm should be disqualified from representing the plaintiff because Sinclair previously served as defense counsel for Beverly Enterprises Florida, Inc. ("BEF"), a subsidiary of BHRS, in a substantially similar nursing home malpractice case. Sinclair contends that there is no basis for disqualification because no attorney client relationship existed between BHRS and Sinclair. The attorney client relationship, according to Sinclair, was between Sinclair and BEF, only, and not between Sinclair and BHRS, the parent of BEF. Sinclair further argues that even if there was an attorney client relationship with BEI and BHRS, this case is not substantially similar to the prior nursing home case [2].

### FACTUAL FINDINGS

Both parties filed affidavits in support of their positions. (Docs. 35 & 46). In addition the parties presented testimony at the evidentiary hearing. BHRS presented the testimony of Charles Sinclair, John Thornton, a senior partner of the firm Thornton & Mastrucci [3]—which was Sinclair's prior firm and the firm that continues to represent Beverly in the Woods Case—and Debbie Mann, a claims examiner for PLCM Group, Inc., the outside claims manager for all of Beverly's nursing home litigation. Sinclair did not present any witnesses but did offer testimony by way of proffer in support of his position.

BEF, the defendant in the Woods Case, is a wholly owned subsidiary of BHRS, the defendant in this case (Def.Ex."4"). BHRS, in turn, is a wholly owned subsidiary of Beverly Enterprises, Inc. ("BEI"), based in Fort Smith, Arkansas. BEI is the largest operator of nursing homes in the United States with approximately 570 facilities in about 30 states (Pl.Ex."F"). In mid 1997 Sinclair and his partner at the

time, John Thornton, traveled to the corporate headquarters of BEI in Fort Smith, Arkansas to meet with Brian Riddick, an in-house attorney for BEI, who was responsible for supervising the litigation of BEI and all of its subsidiaries. The admitted purpose of the trip was to obtain nursing home defense business from BEI in cases filed in Florida. John Thornton testified that he and Sinclair discussed with BEI's in-house litigation attorney the referral of nursing home cases by BEI and its subsidiaries. At the meeting in Arkansas there was a general discussion regarding the locations of Beverly's nursing homes, throughout the United States, and the types of cases, generally, BEI was involved with. Shortly after the trip to Fort Smith, Sinclair was retained to represent BEF in the Woods Case. The retention letter from BEI's in-house counsel confirms "that you [Sinclair] have been retained to represent the interests of Beverly Enterprises, Inc. and/or its subsidiary ..." in the Woods Case (Def.Ex."1"). The retention letter was written on BEI stationery and further informed Sinclair that he would be contacted by Debbie Mann of PLCM, the claims administrator for BEI's nursing home cases.

Sinclair represented BEF in the Woods Case from approximately October, 1997 until January 29, 1999, when he left the Thornton firm and became a partner at Ford & Sinclair, the firm presently representing plaintiff in this case. The Woods Case involved an elderly female admitted to the nursing home for rehabilitative therapy, who later died. The plaintiff alleged in the Woods Case that BEF failed to provide nursing home residents with their statutorily enumerated "resident rights" under Fla.Stat. §§ 400 *et. seq.* According to Sinclair the Woods Case involved nothing more than an elderly pa-

**2.** The prior case was styled *Rosa Bush Nwaukoni on behalf of the Estate of Lou Ella Woods v. Beverly Enterprises–Florida, Inc., a California Corporation d/b/a Beverly Gulf Coast–Florida, Inc., d/b/a Beverly Manor of Margate,* filed in 1997 and still pending in the Circuit Court

of the 17th Judicial Circuit in and For Broward County, Florida (the "Woods Case").

**3.** Thornton & Mastrucci was known as Thornton, Mastrucci & Sinclair prior to Sinclair leaving the firm.

tient who died as a result of "not receiving a sweater." Sinclair characterized the case as insignificant with a nuisance settlement value, if any. Notwithstanding this characterization, during the course of Sinclair's representation of BEF, he met with and interviewed the Director of the facility, interviewed various nursing personnel, consulted with an expert, prepared witnesses for deposition testimony and corresponded with and discussed the case, and the strategy for defense of the case, with Debbie Mann, the claims administrator. According to Thornton, the file reflects that Sinclair spent 27 hours meeting with the Director of Nursing, the administrator of the facility and other personnel and spent approximately 8 hours corresponding with or discussing the case with Debbie Mann.

In addition Sinclair was copied with confidential internal reports from the claims administrator discussing the case, Beverly's strategies and the assessment of liability and damages (Def.Ex."2").[4] As one of the attorneys representing BEI in nursing home cases, Sinclair was provided with the BEI guidelines for handling these types of cases. (Def.Ex."3"). Further, because of the prevalence of claims for punitive damages in these types of cases Sinclair was provided by BEI with a copy of the audited financial statements of BEF (Def.Ex."3").

Sinclair withdrew from the Thornton firm on or around January 29, 1999. The Thornton firm continues to represent BEF in the Woods Case. Approximately one month after leaving the Thornton firm Sinclair requested permission to appear in this case, as co-counsel, on behalf of the plaintiff (Doc. 24), and was granted permission to appear on March 16, 1999 (Doc. 27). The instant motion was filed one month later apparently after BEI's counsel attempted to have Sinclair voluntarily recuse himself from representing plaintiff in this case (Def.Ex."9").

4. In addition, these reports were copied to Brian Riddick the in-house attorney for BEI and the individual who actually retained Sin-

### ANALYSIS

The Rules of Professional Conduct of the Rules Regulating the Florida Bar govern the professional conduct of members of the bar of the United States District Court of the Northern District of Florida. N.D.Fla. Local Rule 11.1(G)(1).

Rule 4–1.9 of the Rules Regulating the Florida Bar governs disqualification for conflicts of interest with a former client. Rule 4–1.9 provides in relevant part that:

> [a] lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b) use information relating to the representation to the disadvantage of the former client except as rule 4–1.6 would permit with respect to a client or when the information has become generally known.

■ In order to prevail in a motion to disqualify under Rule 4–1.9, the movant must establish: (i) the existence of a prior attorney/client relationship with the movant; and (ii) that the matters in the pending suit are substantially related to the previous matter or cause of action. *Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 728 (11th Cir.1988). Where there is an attorney-client relationship, the law creates an irrefutable presumption that confidences have been disclosed between the attorney and the client. *See, State Farm Mutual Auto. Ins. Co. v. K.A.W.*, 575 So.2d 630, 633–34 (Fla.1991); *McPartland v. ISI Investment Services, Inc.*, 890 F.Supp. 1029 (M.D.Fla.1995). The presumption is irrefutable because it is difficult to establish that confidences were actually disclosed to an opponent, and because such a

clair on behalf of "BEI and its subsidiaries." (Def.Ex."2").

situation is "rife with the possibility of discredit to the bar and the administration of justice." *Id.* at 634.

## A. Existence of Attorney/Client Relationship

■ Generally, an attorney is not presumed to also represent an organization such as a corporate parent or subsidiary solely by virtue of having represented the client. *See,* Comments to Rule of Professional Conduct 4–1.13, *The Florida Bar Re: Amendments to Rules Regulating the Florida Bar,* 587 So.2d 1121, 1130 (Fla. 1991). There are, however, exceptions to this general rule. For example, when an affiliate actually is the alter ego of the organizational client or when the client has revealed confidential information to an attorney with the reasonable expectation that the information would not be used adversely to the client's affiliates, the attorney can be deemed to have an attorney client relationship with the affiliate. *Id.* at 1130. Here, the evidence establishes that there was an attorney client relationship with not only BEF but the parent and affiliates of BEF. Further, the exception to the general rule applies here because of the centralized reporting requirements and the contact with and supervision by Beverly's claims administrator.

Sinclair narrowly argues that neither BEI nor BHRS were his clients because he only represented BEI in the Woods Case. The evidence introduced at the evidentiary hearing indicates otherwise. John Thornton, Sinclair's partner and the individual who accompanied Sinclair on the initial trip to Arkansas, testified that it was "clear from the file that BEI and BHRS were clients." Thornton indicated that when he and Sinclair went to Arkansas the promise from BEI's in-house counsel to send business applied to BEI and its affiliates. Further, Thornton testified that in situations, like here, where there is a vertical organization of parents and subsidiaries "you represent the companies from the top down." This testimony while not dispositive on the subjective perception of the client is, nonetheless, highly persuasive

as to the view of the very law firm that undertook the representation in the Woods Case.

■ Whether a person who consults a lawyer is a "client" depends on the subjective intent of the person seeking the consultation, rather than what the lawyer does. *Dean v. Dean,* 607 So.2d 494 (Fla. 4th DCA 1992) ("The focus . . . is on the perspective of the person seeking out the lawyer, not on what the lawyer does after the consultation."). Although the in-house lawyer for BEI did not testify, the retention letter initially sent to Sinclair by BEI is conclusive on the issue of the subjective perception of BEI to be a client of Sinclair. On October 10, 1997 the BEI in-house litigation attorney sent a written confirmation to Sinclair declaring in unambiguous words that Sinclair had "been retained to represent the interests of Beverly Enterprises, Inc. and/or its subsidiary." (Def.Ex. "1") The letter is on the stationery of BEI, and not BEF, and bears the Fort Smith, Arkansas address where Sinclair met the BEI representatives on his business trip to obtain business. Based on this letter, alone, it is clear that Sinclair was retained by not only BEF but its ultimate parent, BEI.

■ Furthermore, all of the nursing home litigation for the Beverly companies was administered by one company, PLCM Group, and in particular, Debbie Mann. Ms Mann testified that she was responsible for all nursing home litigation of Beverly licensed facilities in the State of Florida. She is the individual responsible for supervising this litigation for BHRS in this case and is the person responsible for supervising the Woods Case. She testified that during the course of representing BEF in the Woods Case, Sinclair "was privy to information not available through discovery" and a "wealth of information" relating to policies, procedures and practices of BEI and its subsidiaries "which would not have been available to Sinclair but for the attorney-client privilege." The fact that BEI handles all of its nursing home litiga-

tion through a central claims administrator, who communicates case evaluations and strategies to BEI's in-house litigation attorney, evidences that the client—BEI—intends attorneys representing it to be privy to all information utilized by BEI and its subsidiaries to defend nursing home cases. It would be virtually impossible to segregate the representation of each subsidiary under a system like this. This system of centrally administering claims allows the defense attorneys to have access to the corporate strategies and defensive approaches of BEI as an entity. Where a parent corporation, as here, supervises litigation and has the right to steer such litigation of its subsidiaries, the attorney is deemed to represent the entire organization and not just the named entity. *See, Hartford Accident and Indemnity Co. v. RJR Nabisco, Inc.,* 721 F.Supp. 534, 540 (S.D.N.Y.1989) (Parent and subsidiary are deemed a client for disqualification purposes where in-house lawyer for parent steered product liability claims against subsidiary). This is precisely the reason the comments to Rule 4–1.13 provide an exception to the general rule so that an organization can be treated, and dealt with, as a whole and not just as separate and distinct entities.[5] Accordingly, the court finds that there was an attorney/client relationship between Sinclair, on the one hand, and BEI, and its subsidiaries, including BHRS, on the other hand.

### B. This Case Is Substantially Related to The Woods Case

 Having satisfied the first prong for disqualification the court must consider whether the instant case and the Woods Case are "substantially related." *Cox,* 847 F.2d at 728. "This is done by demonstrating the relationship between the subject matters, issues and causes of action of both the present and previous representations." *Contant v. Kawasaki Motors Corporation,* 826 F.Supp. 427, 429 (M.D.Fla.

1993). To be "substantially related" the matters "need only be akin to the present action in a way reasonable persons would understand as important to the issues involved." *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1341, 1346 (5th Cir.1981).

The disputed issues in each case involve whether appropriate care was provided, whether the nursing facilities were properly staffed, whether personnel were adequately trained and supervised and whether operating policies and procedures were appropriate. Notably, both cases claim a violation of the Nursing Home Resident's Rights. While these types of allegations are uniform in most nursing home cases, and the particular facts and circumstances surrounding the death of the patient may differ, both cases invariably will focus on staffing, supervision, training and operating policy issues. By necessity, this inquiry would implicate an examination of the corporate policies of BEI and its subsidiaries, concerning staffing, training and supervision of its residents. The claims examiner, Debbie Mann, testified that in her view the matters are substantially related. This position was also voiced by John Thornton, who indicated that there was a commonality of issues in the two cases concerning the alleged inadequacy of staffing, training, supervision and budgeting. It is not unreasonable to conclude that information learned in the Woods Case from interviews with nursing staff and directors, as well as information learned from Debbie Mann, would be relevant to the prosecution of the instant case. In addition, according to John Thornton, there is an informational advantage to Sinclair in the instant case because of Sinclair's knowledge of BEI's corporate posture regarding its defense of nursing home claims, its tactics with regard to the defense of these types of claims and its corporate position regarding their approach

---

5. The court's holding that the BEI organization can be treated as a whole does not mean that BEI and its subsidiaries are to be deemed alter egos of each other for liability purposes.

It only means that BEI's supervision and organizational handling of nursing home claims is such that the attorney client relationship must include BEI and its subsidiaries.

to settlement, all of which were learned by Sinclair during his prior representation.

Because the court finds that a "substantial relationship" exists between the two cases, the irrefutable presumption arises that confidential information was disclosed. *See, Duncan v. Merrill, Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1028 (5th Cir.1981). "The presumption acknowledges the difficulty of proving that confidential information useful to the attorney's current client was given to the attorney." *State Farm Mutual Automobile Ins. Co. v. K.A.W.,* 575 So.2d 630, 633 (Fla.1991). The reason for the presumption is obvious. "The presumption avoids compelling the former client to prove the very things that he seeks to keep confidential." *In re Corrugated Container Antitrust Litigation,* 659 F.2d at 1347.The fact that Sinclair contends he did not receive any confidential information is entitled to little weight where a finding, as here, is made that the matters are "substantially related." *See, Government of India v. Cook Indus., Inc.,* 422 F.Supp. 1057, 1060 (S.D.N.Y.1976).

Accordingly, because the court concludes that this case is "substantially related" to the Woods Case, Sinclair and the members and associates of his firm, Ford & Sinclair, *see, Castro v. State,* 597 So.2d 259, 260 (Fla.1992) ("a lawyer's ethical obligations to former clients generally require disqualification of the lawyer's entire firm . . .") must be disqualified from representing plaintiff in this action.

Defendant has also requested the disqualification of plaintiff's co-counsel, Allen W. Lindsay and his law firm, Lindsay, Andrews, Leonard & Slingerland, P.A. (The "Lindsay firm") because "the public policy concerns, which require disqualification of all lawyers in Sinclair's firm apply equally to attorneys who are associated with him as co-counsel." (*see,* Doc. 35, p. 5). In general the law does not impute disqualification between firms, even where members of the two firms are working together, so long as there is "only a small actual risk of confidential client information spreading from the primarily conflicted lawyer to the second firm." *See, Akerly v. Red Barn System, Inc.,* 551 F.2d 539 (3rd Cir.1977) (refusing to impute disqualification between firms because peripheral role of disqualified local counsel made risk of abuse of confidences low). Although the defendant is not required to establish that a firm subject to disqualification disclosed actual confidences, *see, American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125, 1129 (5th cir.1971), the defendant seeking disqualification must do something more than merely assert that the two firms associated themselves as co-counsel, or that the firm subject to disqualification had potential access to confidential records. The fact that the two firms have associated as co-counsel does not itself establish that their relationship is so close as to impute disqualification. *See, Smith v. Whatcott,* 774 F.2d 1032, 1034–35 (10th Cir.1985); *The Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 235–36 (2nd Cir.1977).

Here, defendant has presented no evidence of the relationship between the Lindsay firm and Sinclair, other than that they were co-counsel. The file reflects that Sinclair has been lead counsel since he appeared in the case, and was obviously brought into the case because of his expertise in nursing home litigation. Indeed, the Lindsay firm filed a motion for an extension of the deadlines in the initial scheduling order so that Sinclair could be brought into the case. In the absence of a showing that Lindsay's role is anything more than local counsel and in the absence of a showing that there is a risk of confidential information flowing to him in that role, there is no basis to impute disqualification to the Lindsay firm. *See, American Can Co.,* 436 F.2d 1125 (disqualification is not imputed on a public policy rationale—potential access to confidential information held by the primarily-conflicted attorney is insufficient for disqualification). Therefore, without a more detailed showing, disqualification will not be imputed to the Lindsay firm. Accordingly, it is:

**ORDERED AND ADJUDGED that:**

1. The Motion To Disqualify (doc. 34) filed by defendant, Beverly Health and Rehabilitation Services, Inc., d/b/a Gulf Coast Convalescent Center is hereby **GRANTED** and Charles H. Sinclair and the partners and associates of the firm of Ford & Sinclair are hereby disqualified from representing the plaintiff in this matter.

2. Plaintiff shall have 20 days to retain new counsel or advise the court as to whether the Lindsay firm will continue as counsel for plaintiff in this matter.

3. All further proceedings in this matter are stayed for the earlier of 20 days from the date of this order or the date the Court is advised in writing by plaintiff that the Lindsay firm will continue as counsel for plaintiff.

**DONE AND ORDERED.**